Please the court. I'm Kevin Stalworthy. I represent Mr. Cobar. I'm here on two issues, your honors, the sentencing and entrapment denial issue and the denial of the motion for new trial. I just want to start briefly with some background information. You know, my client, first-time drug offender, 235-month sentence. The safety valve wasn't raised or didn't apply to him. He's a first-time felony from this conviction. No criminal history, age 43, native Guatemala. Arrested on April 13, 2004, 8 years ago. He's been in custody 8 years. This is what we call a dry case. No actual narcotics ever found. The informant was never provided any drugs from my client. Your Honor, we believe the records show they had no ability or predisposition to commit these crimes. Mr. Stalworthy, the district judge found that the initial negotiation was for 400 kilos, but your client countered with 1,000. And then further, as a matter of fact, that when these transactions fell through on three different occasions, it was your client who kept calling the government trying to sort of rekindle the deal. That tends to undercut the argument that you're making to us that your client was somehow not predisposed. Your Honor, there's a difference between puffing and reality, you know, having a predisposition. I mean, we have Detective Guerra who said, you know, the 400 kilos, I was told by Detective Parenteau, he decided on that amount. Now, Detective Parenteau did say, as you said, he said, I came up with a number that sounded like a good number to me, the 400 kilos. But he did say, yeah, it was relayed to me, he didn't actually talk to Kovar, but it was relayed to me that he said he could come up to 1,000 kilos. But, you know, Judge, that's a hearsay or a related argument from an informant that we know was deactivated. But wasn't the initial reaction, whoa, wait a second, I'm just here to talk about 400. Let's not elevate this to 1,000. That is what Detective Guerra said. There's no question he said that. And the district court sort of focused on that in his factual findings to rule against you. They did. But, Your Honor, I think you've got to look at a situation here. You've got a young man who's never been – there's anything in the record who's been in trouble before. But on the denying of the sentencing entrapment issue, there's really was no factual finding or legal findings regarding the entrapment that was done prior to the sentence. It was all done after the fact. Sentencing entrapment involves a situation where there is exhortation of the person to up what he was otherwise planning to do or offering to do. And there was none of that here. Right? I mean, what really happened here, it seems to me, is that you failed with your actual entrapment defense at trial. And this is kind of a rehash of it. It's not really a sentencing entrapment defense. The attorney that tried the case did have an entrapment defense. Right. And she did not prevail on it. That's correct, Your Honor.  And so after that, the amount of the drugs really – I mean, either he was predisposed to deal drugs or he wasn't predisposed to deal drugs. It was determined that he was. The amount of the drugs is really not – wasn't really pushed or exacerbated or anything. Well, the amount of the drugs, Judge, sent the sentence. I understand that. But he wasn't – your real argument is that he wasn't trying to deal the drugs at all. He was puffing. He was puffing and saying he could do anything. Well, Judge, I think he was trying to make money. And I think the record is clear in that, in sentencing, you know, the statements of counsel, is that what he did was stupid. And he was trying to make money, the more the better, meaning more drugs, even better, from his point of view. From his point of view. But let me go to the Naranjo case. You know, there's some protections in place here that we need to be concerned about, notwithstanding what you said. The Court is obligated to make express factual findings. There's no legal authority that the three 3553A factors can substitute for that. The district court was, you know, obligated to make these findings. In Naranjo, it basically – we have the similar cases we have here. We have a – the Court says – found that the sentencing entrapment had not occurred, because if you look at the full situation, it seems pretty clear that the DEA had a pretty good reason to believe that Naranjo had been heavily involved in drug trafficking. Well, all we have in our case is his puffing about, you know, I can get you, I can get you, and we can get you. And about 20 phone calls between him and the drug dealers trying to set it up. There were phone calls. There's no question about that. And Judge Mahan did state that. But this – but, you know, Judge Mahan's statement basically as to why he found this, which was done after he had already sentenced him, I mean, Mr. Kobar was sentenced and the government got up and said, well, look, Judge, you haven't done this right. You've sentencing already to 20 years, basically, but you haven't made any factual findings as to what happened here. And basically his factual findings were the phone calls and the correspondence. That's all he said. One sentence. He was the finder of fact with regard to one of the defendants, was he not? He was. And he was the finder of fact for my client. Right. And so, I mean, he listened to all of the evidence, and then he – I will agree to you it's very brief, but he certainly did reference all that. I mean, there are 27 recorded phone calls here. And we have sufficient record for you to review under the Naranjo. Well, we can look at the contents of the 27 phone calls and see what your client said. And based on what I've seen so far, I don't think it's going to be helpful to him on this issue. Well, you know, you also have to look at, as the Court said, under the Mejia decision, the two factors that are involved here are the lack of intent to produce the quantity of drugs and the lack of capacity. I don't think and believe there was any evidence that he had the capacity to do this. First of all, to bring these drugs in the country, to find – he had no prior criminal history, no evidence that he was any prior to drug deals. The kilos, the 400 kilos, we've talked about that. There's no factual findings of these two situations. The truck in Panama that got turned around at the police roadblock, that was just more puffing, that it really didn't have the 400 kilos? Judge, you know, that's hearsay. That's all I can tell you. It's hearsay. And the judge, Judge Mahan, did rely on that. Well, is it not an admission by your client, which is an exception to the hearsay rule? It is. We did say that the truck – he did say that, Your Honor. He did say that, yeah. He did. 400 kilograms in a warehouse, which is what the judge said. I don't know why you're saying the judge didn't make findings. He said, as far as we know, there were 400 kilos of drugs in the warehouse in Panama. The only reason it didn't get delivered was because the police set up a roadblock. There were 25 phone calls. He was involved in 24 of them. You show remarkable affinity and connection to various people involved in drug trafficking, and the government has proved its case.  I just don't feel like the factors in the Naranjo decision were followed. And if you look at what they did there, it was a one-sentence thing, and the Ninth Circuit, that particular panel, said it wasn't sufficient. Excuse me, sufficient. But let me turn to the motion for new trial, because I see I'm about halfway through my time, if I could. After this trial ended, the government disclosed that the informant who testified at trial, Carlos Aguilar Alvarez, was deemed by the DEA to be unreliable and untruthful. He was deactivated as a paid informant. Mr. Alvarez, Aguilar Alvarez, testified on February 12th and 13th of a seven-and-a-half – two days of a seven-and-a-half-day trial. The Court denied our motion for a new trial on November 8th, 2010. The problem with it is that the Court's order lacks any substantive findings regarding the confidential informant and the impact of the testimony on Kobar's conviction. I thought the district court said basically that the informant had been – what was his colorful phrase, bloodied six ways to Sunday on cross-examination? And didn't Judge Mahan also say, look, I was the finder of fact. He didn't quite come out and say I didn't believe a word the guy said, but he did say he wasn't all that significant to the government's case, because really what he did was to confirm whose voice was on the recordings, but the undercover officer, Guerrero, was able to do that. So he wasn't all that significant to the process. Well, he did more than that. He's the one who testified. This unreliable and untruthful person is deemed by the DEA as the one who testified that Kobar initiated the conversation with him and not vice versa, which I think belies that. But if you look at what the judge did, he just said in a sentence on his order, there's no parallel – there's no relationship and no parallels between the two cases. Isn't that a finding of fact as to the reasons why the person was deactivated in the other case, in your case? It's a finding of fact on documents, Mr. Kobar's counsel, and he never got to see. This reason for his deactivation and the reason that he's unreliable and truthful, these documents were submitted in camera to Judge Mahan. We never got to see them. Well, we can look at them. I mean, we've looked at them. I saw that you requested that. We did. We looked at them, and Judge Mahan looked at them twice and found that there was no Brady material in there that was withheld. So assuming that we agree based on our own independent review, that's another finding of fact that doesn't help. I guess – I guess I just expect when a man gets 20 years, Judge, that, you know, they're going to go through the Davis factors. The judge is going to say, you know, was the – you know, let's go through U.S. v. Davis. Was the evidence newly discovered? Was the material not merely cumulative or impeaching? Was there – Well, but he did. He said it's not impeaching. One sentence. He said it's not impeaching, that it basically is completely irrelevant and wouldn't have made a difference.  in an oral argument. That's – he may have said that in an oral argument. I can't remember precisely. I was there, but I know in his order he didn't. Well, I mean, we have the transcript of what he said. Yeah, we do. And I can't recall exactly. He did say that. Okay. Okay. But, you know, it just seems to me that his findings were just not specific enough so that we could evaluate. Okay. I thought his findings were very specific as to the fact that he was trier of fact and this testimony, as far as he was concerned, just didn't matter very much. Well, he did say that. He did say that in some detail. Right. As to why it didn't matter very much. Right. And I see I have three and a half minutes, and if you have no other questions, I'd like to reserve that time. You certainly may do that. We'll hear from the government. Mr. Goodman. May it please the Court. My name is Dan Goodman. I'm with the United States Department of Justice representing the Eppley United States of America. The district court did not abuse its discretion in denying the defendant's motion for new trial. The new information provided by the government is not material. It is merely impeaching, and it would have not resulted in a new trial. The government informed the defendants that confidential informant Aguilar had recently been deactivated as a DEA informant. Aguilar had exhibited an unsatisfactory behavior in a subsequent matter that had nothing to do with Cobar or Gonzales-Largo. The government deserves credit for apprising the defendants of the new unfavorable information about one of its witnesses, even though the witness's dishonest conduct occurred after the trial in this case. Well, certainly, if the information had been available, it could have been used to impeach him. And although I know there seems to be a law saying that doesn't matter for a new trial, I don't understand how that could be in McReach's situation. If you had an important witness and this was critical to his credibility, I would think that you might well get a new trial. But so doesn't everything turn essentially on, really not on how connected it is, but whether it mattered in the trial? In other words, even if it was totally unconnected, it could still have been important in the trial had it been available at the time of the trial, which it wasn't. It wasn't. That's correct. And we made the determination that because this was bad enough information that we should err on the side of disclosure. If, in fact, it's error, you know, your court has held in Brumell v. Alvarez that evidence impeaching the testimony of the government witnesses does fall within the Brady rule when the result of the witness's reliability may be determinative of the trial. Here we think that, like Judge Mahan found, and he found it in a bench trial, that Aguilar was a minor witness. Certainly Detective Guerra was the major witness against Kobar. There was also Officer Scott, Officer Sandoval. There were a lot of witnesses, a lot of more important witnesses than Aguilar as far as Kobar was concerned. And that's what the district court found. In fact, the district court said that if it depended, if this case had depended on Aguilar's testimony, he probably would have acquitted Mr. Kobar. And then, as Judge Tolman indicates, the district court found that Mr. Aguilar was cross-examined six ways from Sunday, that he was scorched in the lengthy cross-examination, and further, the information that Aguilar provided was confirmed, namely that Kobar was someone who was eager and willing to try to get large quantities of cocaine and heroin and import them into the country for DEA. Kagan. Any of the Aguilar testimony relevant to the sentencing entrapment or to the entrapment leaving apart the sentencing in that he, his account of how the two of them first got together was relevant in some way to how anxious the defendant was to sell the drug to Aguilar?  Or was it something else? Well, that's the one thing besides introducing some tapes that Aguilar was important to in terms of showing how the government DEA became aware of Kobar's decision. I understand they learned about him from Aguilar, but I'm asking what did Aguilar represent at trial about exactly what the interchange between them was? Between Kobar and Aguilar, that led to him going to the police and saying, this guy wants to sell a huge amount of cocaine. Aguilar indicated that somebody he knew in Guatemala was willing to supply drugs, and that person was Mr. Kobar. Mr. Kobar actually then came to Aguilar, and Aguilar then set up the initial meeting with Detective Guerra at the Bahama Breeze restaurant, introduced, in effect, Kobar to the DEA agent, Mariscus Guerra, and that was the primary function. Now, in terms of sentencing entrapment, there's really nothing there about entrapment, as I think the questioning has pointed out, that Kobar indicated to Guerra at that first meeting that he couldn't supply up to 1,000 kilograms of cocaine, and it was the DEA agent who said, whoa, slow down, we only want 400, we don't want 1,000. And that's the exact opposite of the Naranjo situation. The government is trying to slow down, not build up to a ---- Well, could it have mattered to the entrapment defense at trial that Aguilar said that Kobar came to him and said set up this meeting? I'm just trying to really pierce the question of whether he was really largely I mean, I understand he was the connective, but the question is was he the connective in a way that mattered to the course of the trial in any significant way, and that would have to be with regard to the entrapment defense. Okay. The entrapment defense, not the sentencing entrapment, isn't really at issue here, so this is the question. No, but it's an issue as to whether he was harmless at the trial, whether any questions of his credibility would have mattered at the trial. Well, I think not in the sense that if you just looked at Detective Guerra's testimony alone, which preceded Aguilar's trial, that that alone would have been sufficient to convict Mr. Kobar. And you had all the other tape recordings that were introduced, and the majority of the tape recordings were introduced through Detective Guerra, not through Aguilar. You hear Kobar talking first to Dora, then to Gonzalo Zlargo, then to Don Filo. You have the meeting in McAllen, Texas with Don Filo, then you finally have the offer to bring the heroin or supply the heroin in New Jersey, and you have the eventual arrest of Mr. Kobar with the $210,000 in New York. When you look at all of the other evidence, I really don't think – well, I think that Judge Mahan was right in saying that with respect to Mr. Kobar, Aguilar really was a pretty minor witness, and he was one who was impeached quite thoroughly. He was impeached about coming into the United States as an illegal immigrant with falsified papers prepared by a drug cartel. He was impeached about his prior Federal DUI conviction. He was indeed cross-examined six ways from Sunday. And so even though he was on the stand for a long time, he really was not an essential witness as far as proving the government's case. And we know with unusual certainty for Mr. Kobar, because it was a bench trial, that Aguilar's credibility really was not material to his finding of guilt. And with Mr. Gonzalo Zlargo, of course, the Court said that Aguilar was a pretty peripheral witness. There was only one tape, I think, that was introduced through Mr. Aguilar, where Gonzalo Zlargo's voice was on the tape. He was really, even though he was a minor witness with respect to Mr. Kobar, he was a much more important witness for Mr. Kobar than he was for Gonzalo Zlargo. So I don't think that either of the two defendants' motion for new trial is dependent on this newly discovered evidence. Unless the Court has any other questions, we ask that the district court affirm the conviction of Mr. Kobar and affirm the denial of the motions for new trial. Thank you, counsel. Mr. Stalworthy, you have some time remaining. I'll be very brief. I do want to follow up on the questions of whether or not credibility mattered at trial. If you look in record ER 220, this is Aguilar, the informant. He was asked a question, but how did this contact initially happen with Mr. Kobar, that is. Answer, I was referred to him by my friend Mario. And so we know that, you know, Aguilar was referred, he says, by a friend named Mario to Kobar. And then the next question is, okay, who contacted who first? And he says, Mr. Rene called me. So I just find that suspicious, that he would say that Kobar was referred to me by a friend named Mario, but he's the one who's contacted me, and that he's just sitting patiently waiting for him to call. And if you look at his testimony with regard to the 400 kilos on ER 223, what sort of quantities of these drugs did you discuss at the meeting at the Bahama Breeze? We talked about a lot, but Mr. Kobar said, oh, this, excuse me, this is the detective Parenteau, excuse me. This is Detective Parenteau. We talked a lot, but Mr. Kobar said that the contacts he had would be able to move any quantity we wished, but we started talking about the 400 kilos. You know, he was, Kobar was there to listen, but the 400 kilo amount did come from the detective. That's all I have. Well, yeah, but even that last passage suggests that it's the people they're dealing with who are offering more. We can basically supply as much as you want. But that's the whole point. He doesn't have the capacity. He doesn't have the capacity. That's not sentencing entrapment. That's the proper handling. That's one of the facts. This is the mirror image of the typical sentencing entrapment case where it's the agents who are entitling the defendant to do a bigger deal than the defendant is originally interested in doing. Right, but the second element in entrapment. I don't think I've ever seen a case where the agent said, Whoa, a thousand kilos? I can't do a thousand kilos. But, Judge, that's the second factor in entrapment that the U.S. I mean, I can imagine the paperwork he'd have to do with DEA headquarters to get authorization to front that kind of money. And that's my point. The second factor in U.S. v. Major, and it's footnote 17 in the sentencing guidelines, does he lack the capacity to produce the quantity of drugs? Clearly, he can't produce any quantity they want. And that's the weight you've got to give that. And they're the ones who set up the 400 kilos. The answer was I can't do 400. The best I can do is 3 or 5 or 20. But it's just the mirror opposite. But that goes to the weight as to what I think supports what I'm saying. Well, we are talking about weight. That's true. A thousand kilos versus 400. But your argument, as I understand it, is he had no capacity, i.e., he was entrapped altogether. It's not a sentencing entrapment argument, it seems to me. That's the problem we're having. Well, if there's any way to mitigate his sentence on a downward departure, this is the way to do it. It's too bad he doesn't have the safety valve. Yeah. Yeah. Thank you. Thank you, counsel. We appreciate the arguments of both counsel. The case is submitted. We'll take about a 10-minute break before we complete this morning's calendar. Thank you.
judges: Graber, Berzon, Tallman